# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

FILED
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 2:56 pm, Mar 26, 2010

| | |
|---|---|
| In the matter of: ) | |
| ) | Chapter 11 Case |
| HIGHGATE ESTATES, LLC ) | |
| ) | Number 09-41557 |
| *Debtor* ) | |

## ORDER ON MOTION FOR VALUATION

Debtor's case was filed on July 22, 2009. On March 2, 2010, a hearing was held to consider approval of Debtor's Disclosure Statement (<u>Disclosure Statement</u>, Dckt. No. 27) as well as Debtor's Motion for Valuation of Real Estate (<u>Motion</u>, Dckt. No. 29). After consideration of the evidence I now rule on the Motion for Valuation.

Debtor is a land developer which acquired a 254 acre tract in west Chatham County consisting of both developable upland property and wetlands. In 2008 a tract which was believed to be worth approximately fifty percent of the value of the entire tract was sold to one of the co-owners of the LLC, leaving Debtor at the time of filing with approximately 144 acres, of which approximately 93 acres are upland and 51 acres are wetland. Debtor proposes a plan whereby it seeks to have this real estate valued by the Court, and conveyed to the bank in satisfaction of that amount of debt, with any remaining unsecured deficiency to be dealt with in the plan. The debt, including attorney's fees, is approximately $2.5 million.

The property in question is located in western Chatham County near Interstate 16, Georgia highway 204, and Little Neck Road. It is incorporated within the city of Savannah in a planned urban development ("PUD") district approved by local government which encompasses a total of 4000 acres with a density that would permit as many as 11,000 residential units to be built. In March of 2009 the Chatham County Board of Education purchased a tract within a mile of the subject property for the construction of a new high school. Ground is expected to be broken by June of 2011 with a proposed completion date of June of 2012. Within this PUD, known as New Hampstead, there are currently no recreational amenities or completed homes in place. However, a number of subdivisions have been approved and the infrastructure for the lots in those subdivisions is in place. The proximity of Debtor's tract within the PUD to a proposed high school offsets, to a large degree, the absence of any other current amenities. In the ordinary course of things, these amenities should follow the movement of population into the area, but that has not yet occurred.

Debtor commissioned Andrew R. Haman, Jr., who prepared an appraisal in August of 2009 and updated it over the weekend prior to the hearing. SunTrust Bank ("SunTrust") commissioned its own appraiser, Considine & Company, for a separate appraisal. Considine & Company assigned this task to Paige M. Couper. The two appraisers concluded retail values for the tract which were quite close. Mr. Haman reached a conclusion of $2.699 million. Ms. Couper concluded the retail value at $2.6 million. The difference stemmed from the fact that Mr. Haman assigned a per acre value approximately

$500.00 higher than Ms. Couper did to the upland portion, and he also assigned a value of $1,000.00 per acre for the approximate 51 acres of wetlands. Certainly, the $99,000.00 difference in the two values is important, but the real difference of opinion over the present value of the tract arises from (1) the holding period each appraiser believes it will take for an owner to sell this tract, and (2) the appropriate discount rate to apply to the retail value to account for the delay in closing a sale. Both appraisers testified extensively and produced written reports which were admitted into the record.

Mr. Haman, after updating his appraisal, estimated that the holding period would be thirty months and the correct discount rate would be 12%. However, he believes that the 12% discount should not be applied for the first twelve months of the holding period because that is a typical period of time for marketing a tract of land similar to the subject property. His final value, therefore, was $2.2 million. Ms. Couper concluded the holding period would be three years and that the appropriate discount rate would be 15%. These values resulted in her final conclusion of $1.62 million.

Both parties relied on Korpacz Real Estate Investor Surveys to assist them in deciding what the appropriate range for discounting should be. Mr. Haman focused on the quarterly report for malls, office space, warehouses and apartments which showed discount ranges between 7% and 15%. He arrived at a 12% discount rate based on his knowledge of the market and interviews with individuals actively engaged in the local residential real estate market. *See* Exhibit D-2. Ms. Couper relied on a report from the same company, but one

that surveys discount ranges for land development tracts, which revealed a range of discounts from 12% to 30%. She selected a 15% discount rate believing that the location of the property, while not optimum for future real estate development, has certain inherent characteristics which would place it outside the riskiest categories.

Although the absorption rate of lots that are currently in inventory in this part of Chatham County is fairly slow, there is some activity for homes in the price range under $200,000.00. The PUD, as previously mentioned, is located in the city of Savannah, will have city water available to it, and will be in close proximity to the high school, which is anticipated to be completed and ready to accept students within eighteen months. Notwithstanding the current adverse market conditions and the uncertainty as to when the market might change, I agree with Debtor's contention that the tract's proximity to the high school and the availability of municipal water and sewer on this site makes it an attractive tract and therefore subject to a shorter potential holding period. I therefore conclude that a thirty month holding period is a reasonable projection of how long the property might remain on the market from this point forward.

I also conclude that a 12% discount rate is an appropriate rate to apply for the holding period. Ms. Couper produced Exhibit C-2, which shows that for land development in all localities across the country of all sizes, shapes and uses, the discount rate ranges from 12% to 30%. However, the note to that chart makes it clear that those rates include a factor for the developer's profit and not simply the risk-adjusted time value of

money. Mr. Haman produced Exhibit D-2 which revealed discount ranges of 7% to 15%, averaging 10%. Still, Exhibit D-2 is no more conclusive because it deals with more highly developed properties (like malls, office space, warehouses, and apartments) and not raw developable land. However, because of Mr. Haman's consultation regarding relevant discount rates with others actively engaged in the local market, I find his selection of a 12% discount rate to be appropriate.

That rate is above the average discount rate for more highly developed properties, which is appropriate in this case because there is more risk involved in carrying undeveloped property. Although it is at the low range of the Korpacz Report relied upon by Ms. Couper, that report includes an unknown developer's profit. It is also unknown to what extent the properties within its survey had water and sewer infrastructure in place, and I find the low end of the range reported in that survey, to the extent that it is probative, to be an appropriate discount rate to apply. It should be noted that this part of the analysis is highly subjective and untethered by empirical data. But in the final analysis, a 12% discount, priced for risk, that is significantly higher than current no-risk rates, seems most appropriate.[1]

Adopting the $2,699,000.00 value (less $88,000.00 for taxes) and discounting it over a thirty month holding period at 12%, I conclude a value of $1,963,000.00 for the tract. The experts disagreed over whether discount should be applied to only eighteen

---

[1] On the date of this opinion, the 10 year Treasury bill rate was 3.84%. U.S. Treasury - Daily Treasury Yield Curve, http://www.ustreas.gov/offices/domestic-finance/debt-management/interest-rate/yield.shtml (last visited Mar. 25, 2010).

months of the thirty month holding period because the expectation of anyone marketing property such as this would be that one year would be a normal holding period. Both appraisers conceded that there were two opposing views as to whether the discount should apply from day one or only after the typical initial twelve month holding period. Because there is no industry standard of which the Court was made aware and because I am setting the current value of creditor's interest in the property, I conclude that the discount rate should be applied from day one and not after a twelve month delay. *See* In re Raylin Dev. Co., 110 B.R. 259, 261 (Bankr. W.D. Tex. 1989) (noting that "the court does not actually value the *property* but rather the *creditor's interest* in the property," and that "valuation must be approached in large part from the point of view of what the collateral would be worth *in the hands of the creditor* under the circumstances of the case.") (internal citations omitted).

While there is not a specific provision in the Bankruptcy Code which directly addresses this question, there are some general bankruptcy polices related to this issue. For example 11 U.S.C. § 506(a)(1) provides that the amount of an allowed secured claim is "determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." The question I must answer is: "What is it worth now?" not "What will it be worth in one year?" Because the purpose of the valuation is to determine the amount of debt that will be extinguished when the property is surrendered, it follows that I should apply the discount rate starting at the time of the transfer.

Similarly, 11 U.S.C. § 1129(b)(2)(a)(i)(II) requires that, to be fair and equitable to a dissenting, impaired class, a plan must provide "that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." Section 1129(b)(2)(A)(iii) also requires that holders of secured claims receive the indubitable equivalent of the claim. It is inconsistent with the concept of indubitable equivalence that one could set the value of the property and convey it to a lender over that lender's objection to that value, without reducing its value to account for the period of time that the lender will likely have to hold it until it can sell the property and actually receive payment in currency.

Reading these sections together, it is clear that the Bankruptcy Code requires that secured creditors' interest in property be valued at the effective date of a plan, i.e., the present day value of the security which they hold. In the confirmation context, when a claim is being paid, the value of the property on the date of confirmation becomes the principal amount of the reorganized debt and the debtor then receives a market rate of interest on that amount over the period of time the debt is repaid. When property is proposed to be conveyed to the bank in satisfaction of the secured portion of the claim, I conclude that application of the discount rate for property that is not being retained by Debtor and will have to be sold by the bank, at an uncertain future time, is not subject to a breathing spell before the discount is applied.

I therefore hold that the applicable discount rate should be applied over the entire term of the expected holding period.

## **O R D E R**

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that the value of the approximately 144 acres in question, commonly known as New Hampstead Tract R-5, located in Savannah, Chatham County, Georgia, is $2,699,000.00 (less $88,000.00 for taxes) discounted at 12% for 30 months, for a total present value of $1,963,000.00.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 25th day of March, 2010.